`                      UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
                          FORT MYERS DIVISION

JAMES R. PESCI,

                 Plaintiff,

vs.                                    Case No.  2:12-cv-227-FtM-29SPC

TIMOTHY JAMES BUDZ, Executive
Director, RONALD LAWRENZ,
Assistant Facility Administrator
of Security, CRAIG BELOFF, Major,
REBECCA ALLEN, Unit Manager, and
BRANDON MALLOY, Custody Officer,

                 Defendants.
_____

**ORDER OF DISMISSAL**

**I.**

    This matter comes before the Court upon initial review of the
file.  Plaintiff James R. Pesci ("Pesci"), who is civilly confined
at the Florida Civil Commitment Center ("FCCC"), initiated this
action by filing a *pro se* Civil Rights Complaint Form for FCCC
Residents (Doc. #1, Complaint).  Pesci seeks to proceed *in forma
pauperis* in this action.  <u>See</u> Affidavit of Indigence (Doc. #2).
The Complaint  names the following individuals as Defendants:
Timothy James Budz, Executive Director of the FCCC; Ronald Lawrenz,
Assistant Facility Administrator, Security; Craig Beloff, Major at
the FCCC; Rebecca Allen, Unit Manager at the FCCC; and Brandon
Malloy, Custody Officer at the FCCC.  Complaint at 2-3.  The
Complaint alleges that "starting in early September 2010 to the
month of April 2, 2012, Defendants, acting individually or in

concert with one another . . . commenced a series of retaliatory acts against Plaintiff as a consequence of investigative reports that named them and others in a monthly blog entitled Duck Soup" violating Plaintiff's "First, Fourth, and Fourteenth Amendment rights." Id. at 5.  As relief, Plaintiff seeks unspecified compensatory and punitive damages and injunctive relief enjoining further "harassing and retaliatory" actions against him.  Id. at 21.

The Complaint sets forth the following chronology of facts, many of which are extraneous to Plaintiff's constitutional claims against the named Defendants.  Plaintiff wrote and published a newsletter and blog known as "Duck Soup," which contained stories about other FCCC residents[1] and officials.  Id. at 5. According to the Complaint, Duck Soup

> identified these Defendants and their subordinates with an assortment of acts that demonstrated their evident ineptness, wrong doings, cover-ups and vicious assaults against other inmates and highlighted outright corruption with the GEO Corporation office and most especially within the concrete and razor wired domain of the Florida Civil Commitment Center.

Id.  Defendant Budz banned Duck Soup and deemed it contraband in mid November 2010.  Id. at 5.  Prior to this time, Plaintiff

---

[1]Plaintiff refers to the individuals who are confined at the FCCC as "inmates."  Complaint at 5, 7, 14, 17, 18.  The Court recognizes that the individuals who are confined at the FCCC are not incarcerated and not prisoners; and, thus the Court will refer to the individuals as "residents," except where quoting from Plaintiff's Complaint.

asserts that Duck Soup was "enjoyed by both staff and inmates in the facility." Id. at 14.

On September 1, 2010, Defendant Beloff ordered two officers to conduct a "surprise raid" of Plaintiff and his living quarters. Id. at 6. The officers were ordered to "confiscate every piece of paper . . . including any and all of Plaintiff's personal and legal work." Id. Plaintiff contends that Beloff ordered the "raid" of his living quarters because he "was in the process of writing an article" accusing Beloff of "maintaining an unauthorized personal relationship with a female subordinate," and being under investigation for "sexual harassment" for "groping an administrative assistant's buttocks. Id.

Subsequently, on October 28, 2010, Defendant Lawrenz "dispatched" two officers to Plaintiff's dormitory to escort Plaintiff for a strip search, because Lawrenz was told Plaintiff "kept a cell phone secured in his underwear that contained various phone numbers of staff members who were confidential sources to may of the articles that Plaintiff had written and published." Id. at 7. No cell phone was found on Plaintiff, but officers did locate medication that Plaintiff admits he "hoarded." Id. Defendant Lawrenz ordered that Plaintiff be placed in secure management for the medication violation. Id. Plaintiff was "sanctioned with 30 days wing restriction by a Behavioral Management Committee." Plaintiff states the search was ordered by Lawrenz because he was

in the process of writing a story about Defendant Lawrenz' wife being "under investigation for an inflated payroll check scam." Id. at 6-7. Plaintiff further avers that other unidentified residents who were caught with larger amounts of medications were not placed in the secure management unit. Id.

On November 18, 2010, Defendant Beloff, accompanied by Officer Marquez and Dr. Emanoilidis, entered Plaintiff's dormitory and advised him that Duck Soup was "deemed contraband." Id. at 8. Officer Marquez completed a body search of Plaintiff and a search of his room, confiscating Plaintiff's flash drive, his current issue of Duck Soup, and his notes for future articles. Id. In addition to containing articles for Duck Soup, the flash drive contained Plaintiff's legal work, and was not returned to Plaintiff, "[t]hus impeding Plaintiff's ability to litigate pending legal work." Id.

On November 27, 2010, Plaintiff was returned to general population and housed near two residents, whom Plaintiff claims were "confidential informants working for Defendants." Id. On December 1, 2010, Plaintiff was "called out of a treatment group" and advised that his room was being searched. Id. at 8-9. When Plaintiff arrived at his dormitory, "two female employees" were searching Plaintiff's room. Id. at 9. Plaintiff had previously written an article about the two employees "for setting up inmates and engaging in homosexual relations while on duty." Id. The two

staff members discovered a cell phone in Plaintiff's room, for which he was placed on wing restriction for 60 days. Id.

Plaintiff "became upset" as a result of his confinement. Id. Plaintiff also learned from his "staff sources" that a registered nurse was "walked off the compound" after being "wrongfully" accused by Beloff of "holding telephone conversations" on the "confiscated cell phone" and "maintaining an inappropriate relationship" with Plaintiff. Id. After learning this information and "compounded with the fact that staff were refusing to provide [him] with items," Plaintiff began "to kick his door and declare a psychological emergency." Id. Because "administrators" ignored him, Plaintiff "pulled out a handful of various pills and threatened to swallow them." Id. "Staff members who witnessed this laughed and dared Plaintiff to swallow the pills." Id. at 10. Plaintiff swallowed the pills and was transported to the DeSoto Memorial Hospital for treatment. Id. Plaintiff contends that, because "Defendants" were "negligent" in not properly searching him upon intake, he had access to the hoarded medication. Id.

On December 15, 2010, "staff members" were "mocking" Plaintiff about his blog and newsletter. Id. When "staff members" did not allow Plaintiff out of his unit "to socialize or participate in recreation," Plaintiff "became upset" again and "commenced kicking on his door." Id. An unidentified "staff member" "falsely" told

a supervisor that Plaintiff "appeared to have swallowed a razor blade." Id. After Plaintiff refused to "place his hands through a food port to be cuffed up and taken to medical," an Emergency Response Team assembled. Id. Plaintiff then complied. Id.

From December 15th through the 30th, Plaintiff claims he was "taunted by subordinates assigned to" his unit. Id. Plaintiff declared another psychological emergency with the expectation that he would be seen "by a clinician on call to assess [his] complaints and state of mind." Id. Although "staff called in the request," "supervisors or a clinician refused to respond." Id. Plaintiff then "tied numerous pairs of socks together, attached one end securely around his neck and attempted to hang himself." Id. A TST[2] assigned to the unit who saw Plaintiff "hanging from his locker . . . immediately called in an emergency code" and entered the room "to prevent strangulation and provide Plaintiff with air." Id. at 11. When Defendant Beloff arrived, he stated to the TST "Why the f**k did you call this in, you should have let the mother f**ker hang and die." Id.

During this same period, Representatives from the Florida Department of Children and Families ("DCF"), came to the unit in which Plaintiff was being held. Id. Plaintiff "called out" from his room in order "to voice complaints about the treatment to him and others similarly situated." Id. "Staff members called

---

[2]Therapeutic Security Technician.

supervisors," who "attempted to force Plaintiff to cuff up and be taken off unit." Id. Plaintiff was eventually removed from the unit, taken to medical for an assessment, put in a suicide gown, and placed in a seclusion room. Id. Plaintiff remained in the seclusion room for 14 days, during which time, a TST was stationed at his door "around the clock" and he was fed a "finger food diet" that required no utensils. Id. at 12. Plaintiff was "not permitted any items in this room whatsoever." Id. Plaintiff was not allowed to telephone his family on either Christmas or New Year's Day. Id. Plaintiff states he was "advised that these extraordinary measures" were ordered by Defendants Budz, Beloff and Lawrenz. Id.

Plaintiff "pleaded" with staff to allow him to call his attorney or the State abuse hotline, but "Defendants" denied his requests. Id. Plaintiff was given his legal mail to read but was not permitted to reply to any legal correspondence. Id. As a result, Plaintiff states that he was unable to "litigate a pending pro se suit that [he] ultimately lost as a result of this neglect." Id. Plaintiff was released from seclusion after a member of Plaintiff's clinical team spoke to the "Defendants." Id.

On February 8, 2011, Defendant Allen walked into the disciplinary area where Plaintiff was lying on his bed wearing only "a pair of briefs." Id. at 15. Plaintiff claims that Allen "was looking at [his] buttocks." Id. Allen requested a "male staff

member" to hold open the door while she entered the room and
"proceeded to pick up some paperwork on [Plaintiff's] desk, scurry
through it aimlessly and in a strange manner." Id. at 16.  Allen
left the room but then returned to confiscate "miscellaneous
sanitary items" from Plaintiff's room and file a "misbehavior
report" against Plaintiff.  Id.  On another unspecified date,
Allen wrote Plaintiff up for "being in an unauthorized area"
because a staff member had left Plaintiff unattended outside his
designated area.  Id. 16-17.  This charge was later dismissed by
the Behavioral Management Committee.  Id. at 17.  On another
unspecified occasion, Allen removed Plaintiff's "personal towel .
. . from a window that blocked the intense sun from beaming into
his vision."  Id. at 15.  Allen failed to comply with procedures
and complete a "confiscation document" when she took the towel.
Id.  Plaintiff claims that the removal of the towel constituted
"petty theft."  Id.  Plaintiff alleges that these "bogus
disciplinary charges or petty violations that [Allen] would
normally or otherwise overlook" were part of "a spree of harassing
tactics" in retaliation for writing articles in Duck Soup about
Allen's "slew of odd behaviors."  Id. at 14-15.

The same day that Plaintiff completed his 60 day confinement,
Defendant Maloy served Plaintiff with disciplinary infractions for
inciting a riot and disorderly conduct.  Id. at 13.  Ms. Eldrige
investigated the charges and determined that Plaintiff "violated no

rules." Id. at 14.  Nonetheless, the next day, Beloff ordered her to "process the reports, serve them on Plaintiff and immediately place [Plaintiff] in confinement."  Id.

In March 2012, FCCC Resident Haig announced that Plaintiff was a witness in a high-profile triple murder trial.  Id. at 17. Because Resident Haig knew Plaintiff's "correct birth name," Plaintiff believes the information came from Defendant Lawrenz. Id. at 18.  Plaintiff surmises that Defendant Lawrenz had "hopes that Plaintiff would be shunned or assaulted by other inmates" as a result of this information.  Id.  That same month, Defendant Maloy brought an article to the FCCC concerning Plaintiff's testimony at the recent evidentiary hearing concerning the triple homicide case.  Id.  Plaintiff speculates that Maloy hopes to have Plaintiff labeled a "snitch" or "attacked" by other residents.  Id.

On March 15, 2012, Maloy conducted surprise "shakedowns" of other residents' rooms "falsely insinuating . . . that Plaintiff was a confidential source."  Id. at 18.  Petitioner suggests that Maloy is "intentionally and maliciously putting Plaintiff's life in danger."  Id.

On April 2, 2012, Officer Davis advised Plaintiff that his room was being searched.  Id. at 19.  Plaintiff arrived at his room and found an "administrative training captain" supervising the two officers who were searching his room.  Id.  Due to the captain's involvement, Plaintiff suspects that the search was "ordered by

higher ranking officials such as the Defendants named in this suit." Id.

## II.

Despite Plaintiffs' non-prisoner status, before the Court grants Plaintiffs *in forma pauperis* status and directs the U.S. Marshal to serve the Complaint on Defendant, the Court is required to review the Complaint to determine whether the complaint is frivolous, malicious or fails to state a claim.[3] See 28 U.S.C. § 1915(e)(2)(B)(I)-(iii). In essence, § 1915(e)(2) is a screening process, to be applied *sua sponte* and at any time during the proceedings. Additionally, although there is no longer a heightened pleading requirement, Randall v., 610 F.3d 701, 709 (11th Cir. 2012), the Court must read Plaintiff's *pro se* allegations in a liberal fashion. Hughes v. Lott, 350 F.3d 1157, 1160 (11th Cir. 2003).

The standards that apply to a dismissal under Fed. R. Civ. P. 12(b)(6) apply to a dismissal under § 1915. Leal v. Ga. Dep't of Corr., 254 F.3d 1276, 1278-79 (11th Cir. 2001). Under Rule

---

[3] Certain portions of the Prison Litigation Reform Act are not applicable to Plaintiffs due to their status as civil detainees. Troville v. Venz, 303 F.3d 1256, 1260 (11th Cir. 2002). Nonetheless, the United States Court of Appeals for the Eleventh Circuit previously found that a district court did not err by dismissing a Complaint filed by a civil detainee for failure to state a claim under the *in forma pauperis* statute, 28 U.S.C. Section 1915 (e)(2)(B). Id. Other Courts have also found that section 1915(e)(2)(B) is not limited to prisoners, but applies to all persons proceeding *in forma pauperis*. See Calhoun v. Stahl, 254 F.3d 845 (9th Cir. 2001).

12(b)(6), the court views all allegations in the Complaint as true and construes them in the light most favorable to the Plaintiff. Pielage v. McConnell, 516 F.3d 1282, 1284 (11th Cir. 2008). The standard governing Federal Rule of Civil Procedure 12(b)(6) dismissals apply to dismissals under § 1915(e)(2)(B)(ii). Alba v. Montford, 517 F.3d 1249, 1252 (11th Cir. 2008); Mitchell v. Carcass, 112 F.3d 1483, 1490 (11th Cir. 1997). Thus, a complaint is subject to dismissal for failure to state a claim if the facts as plead do not state a claim for relief that is plausible on its face. Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007). A claim is plausible where the plaintiff alleges facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. ____, 129 S. Ct. 1937, 1949 (2009). The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. Twombly, 550 U.S. at 556. Specifically, although a complaint "does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (citations omitted). Thus, "the-defendant-unlawfully harmed me accusation" is insufficient. Ashcroft, 129 S. Ct. at 1949. "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." Id.  The Court may dismiss a case when the allegations in the complaint on their face demonstrate that an affirmative defense bars recovery of the claim.  Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003); Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008).

To state a claim under 42 U.S.C. § 1983, Plaintiff must allege: (1) that the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001).  In addition, Plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation.  Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994).

## III.

Plaintiff failed to sign his Complaint as required by Federal Rule of Civil Procedure 11(a).  Complaint at 21.  Nonetheless, the Court finds it would be futile to direct Plaintiff to sign the Complaint because the Complaint is otherwise subject to dismissal.

While the Complaint is factually detailed, it fails to adequately state a claim as to any of the named Defendants.  The

-12-

Complaint provides a narrative recounting unrelated isolated incidents that took place over a 20 month period of time. The majority of the allegations in the Complaint, contain generic references to all "Defendants," or attributes conduct to various other identified or unidentified "staff members," "supervisors," "staff" or other residents. Consequently, the Complaint fails to allege which, if any, of the named Defendants was involved in the various alleged acts of wrongdoing. Douglas v. Yates, 535 F.3d at 1322 (affirming dismissal of complaint where "complaint fails to allege facts that associate [defendants] with that violation." (quoting Pamel Corp. v. P.R. Highway Auth., 621 F.2d 33, 36 (1st Cir. 1980)("While we do not require technical niceties in pleading, we must demand that the complaint state with some minimal particularity how overt acts of the defendant caused a legal wrong."), 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1234, at 381-85 (3d ed. 2004) ("[A] complaint will be held defective ... if [it] fails to connect the defendant with the alleged wrong.")). Further, the vast majority of the allegations as to Defendant's involvement or motive are wholly conclusory and nothing more than speculation. Such allegations need not be accepted as true, and are insufficient to state a constitutional claim. Iqbal, 129 S.Ct. at 1949.

With respect to Plaintiff's First Amendment claim, the Complaint does not challenge Budz' decision to ban the publication

-13-

of Duck Soup as a violation of Plaintiff's First Amendment rights. Rather, Plaintiff alleges a violation of his First Amendment rights stemming from the various alleged retaliatory actions taken against him because he wrote and published Duck Soup.

In order for Plaintiff to avail himself of the protections of the First Amendment, Plaintiff must allege and be able to establish that: "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action [the disciplinary punishment] and the protected speech [the blog and newsletter]." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). Clearly, the right of free speech protects Plaintiff from grieving the conditions of his confinement to administrators at the FCCC. Boxer v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006). However, a violation of a legitimate institutional regulation is not "protected conduct." Smith, 532 F.3d at 1277.

Here, the Court need not determine whether the publication Duck Soup is protected speech[4] because the Complaint alleges only

---

[4]The undersigned notes that another Judge in the Middle District of Florida concluded that the FCCC's April 2009 policy that restricted the unrestricted copying of Duck Soup did not violate Plaintiff's First Amendment rights, finding, inter alia, that Duck Soup posed a security risk at the FCCC. Pesci v. Budz, Case Number 2:10-cv-428-FtM-36DNF, 2012 WL 397848 (M.D. Fla.

(continued...)

conclusory allegations of a retaliatory motive; it does not allege sufficient facts to raise that conclusion above a speculative level. <u>Iqbal</u>, 129 S. Ct. at 1951. In particular, the Complaint does not allege a casual connection between Duck Soup and the various disciplinary actions taken against him. Indeed, Plaintiff admits that he was placed in secure management on October 28, 2010, due to staff finding hoarded medication on him; and, he was placed on secure management on November 27, 2010, because staff discovering a prohibited cell phone in his living area. Similarly, Plaintiff admits that he voluntarily overdosed on hoarded medication, attempted to hang himself, and yelled out to complain to DCF Officials, prior to being placed in a suicide gown in a seclusion cell in December 2010. Additionally, Plaintiff admits that Defendant Allen legitimately could have written him up for the various minor rule infractions, despite the fact that she had not done so in the past. Consequently, Plaintiff cannot maintain a First Amendment retaliation claims stemming from his placement in disciplinary confinement or in seclusion when he admits he was guilty of disciplinary infractions that resulted in his placement in confinement, and admits to attempting suicide on two separate occasions. <u>O'Bryant v. Finch</u>, 637 F.3d 1207, 1215 (11th Cir. 2011)(stating "a prisoner cannot maintain a retaliation claim when

---

[4](...continued)
February 8, 2012).

-15-

he is convicted of the actual behavioral violation underlying the alleged retaliatory false disciplinary report and there is evidence to sustain the conviction.").

Liberally construed, the Complaint alleges a Fourth Amendment claim stemming from the various searches conducted of Plainitff's living space at the FCCC.  Plaintiff, however, does not have a reasonable expectation of privacy in his dormitory at the FCCC. Thus, Plaintiff cannot show a Fourth Amendment violation stemming from the September 1, 2010, October 28, 2010, November 18, 2010, December 1, 2010, February 8, 2011 and April 2, 2012 searches conducted of his living space. Hudson v. Palmer, 468 U.S. 517, 526 (1984).

Liberally construed, the Complaint appears to allege a First Amendment access to court claim stemming from the confiscation of Plaintiff's jump drive and/or his inability to respond to legal correspondence while in seclusion.  However, Plaintiff does not allege an actual injury in his pursuit of a nonfrivolous, post-conviction claim or civil rights action, such as the denial or dismissal of a direct criminal appeal, habeas petition, or civil rights case. Lewis v. Casey, 518 U.S. 343, 357 (1996); Al-Amin v. Smith, 511 F.3d 1317, 1332-33 (11th Cir. 2008); Bass v. Singletary, 143 F.3d 1442, 1445 (11th Cir. 1998).  Consequently, the Court finds the Complaint, as stated, fails to articulate a First Amendment access to court claim.

Further, any actions grounded in a defendant's negligence or their lack of due care is not actionable under § 1983. See Estelle v. Gamble, 429 U.S. 97, 104 (1976) (a mere accident or negligence involving officials is not sufficient to articulate a § 1983 claim). Thus, to the extent that Plaintiff attributes § 1983 liability upon any Defendant stemming from their alleged failure to search or locate the hoarded pills Plaintiff took in an attempt to commit suicide fails as a matter of law.

Finally, liberally construing the Complaint, Plaintiff alleges a due process violation stemming from his self-destructive acts being caused by "staff members" laughing at him and/or him "being taunted by subordinates" in response to his suicide threats. The Supreme Court has concluded that, as a general rule, civil detainees are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngblood v. Romero, 457 U.S. 307, 322 (1982). Indeed, the involuntarily civilly committed have liberty interests under the due process clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as might be required to ensure safety and freedom from restraint. Id. The Eleventh Circuit similarly has held that "Youngberg establishes that the due process rights of the involuntarily civilly committed are 'at least as extensive' as the

Eighth Amendment 'rights of the criminally institutionalized,' and therefore, 'relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." Lavender v. Kearney, 206 F. App'x 860, *2 (11th Cir. 2006)(footnote omitted)(quoting Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. 1996)).

Here, based upon the facts alleged in the Complaint, none of the named Defendants were present at the time of either of Plaintiff's suicide attempts. Thus, Plaintiff fails to establish a casual connection between any acts by the named Defendants that aggravated his inclination to commit suicide. Cook ex. rel. Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115-16 (11th Cir. 2005)(noting to succeed on § 1983 claim plaintiff must allege that defendant was deliberately indifferent to the possibility of plaintiff's suicide). See also Edwards v. Gilbert, 867 F.2d 1271, 1275 (11th Cir. 1989).

Further, Plaintiff's allegations concerning Maloy's comment to the TST, after Plaintiff attempted to hang himself, as well as Maloy labeling Plaintiff a "snitch," without more, fails to state a constitutional claim. More specifically, Plaintiff "must allege more than that he has been subjected to verbal taunts . . . however distressing in order to make a claim that [officials] have violated their duty of protection or deprived petitioner of his constitutional rights." Edwards v. Gilbert, 867 F.2d 1271, 1274,

n.1 (11th Cir. 1989)(internal quotes and citations omitted). <u>See</u> <u>also</u> <u>Sepulveda v. Burnside</u>, 170 F. App'x 119, 124 (11th Cir. 2006) Plaintiff does not aver that he was subjected to any hostility by any other resident as a result of being labeled a snitch.  <u>See e.g.</u> <u>Harmon v. Berry</u>, 728 F.2d 1407, 1408-08 (11th Cir. 1984)(remanding case because inmate claimed he was being subject to hostile actions from another inmate as a result of being labeled a snitch).

ACCORDINGLY, it is hereby

**ORDERED**:

1.  Plaintiffs' Complaint (Doc. #1) is **DISMISSED without prejudice.**

2.  The **Clerk** shall: (1) enter judgment dismissing this case without prejudice; (2) terminate any pending motions and deadlines; and,(3) close this case.

**DONE AND ORDERED** at Fort Myers, Florida, on this   12th   day of October, 2012.

_____
JOHN E. STEELE
United States District Judge

SA: hmk
Copies: All Parties of Record

-19-